UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO.   8:15-cr-264-SDM-AAS
                                                 8:20-cv-708-SDM-AAS

FRED JOSEPH TURNER
_____/

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:15-cr-264-SDM-AAS
                                               8:23-cv-1427-SDM-AAS

FRED JOSEPH TURNER
_____/

### ORDER

Fred Joseph Turner is imprisoned for 151 months under his convictions for conspiring to distribute and distributing controlled substances and for conspiring to bring an alien into the United States.  In 2019 the convictions and sentences were affirmed on appeal.  In 2020 Turner filed his present motion under 28 U.S.C. § 2255 to vacate his convictions and sentence, which motion alleges claims of ineffective assistance of counsel.  In 2023 Turner filed a motion under Section 2255 asserting entitlement to relief under *Ruan v. United States*, 142 S. Ct. 2370 (2022).  An earlier order (Doc. 31 in 20-cv-708; Doc. 4 in 23-cv-1427) consolidates the two cases into the earlier case number.  This order is structured as follows: Sections I and II address the background of Turner's action and the standard of review for a claim of ineffective

assistance of counsel; Section III reviews the five grounds for relief alleged in 20-cv-708; and Section IV reviews the one ground for relief under *Ruan* alleged in 23-cv-1427.  As determined below, Turner is entitled to no relief.

## I.  BACKGROUND

In affirming the convictions and sentences of Turner and his co-defendant Rosetta Cannata, the circuit court summarized the facts of this case as follows, *United States v. Cannata*, 791 F. App'x 143, 145–46 (11th Cir. 2019):[1]

> Turner and Cannata ran the Gulfshore Pain and Wellness Centre, a pain management clinic with offices in Tampa and Punta Gorda, Florida. Turner was the clinic's only licensed medical doctor. Cannata was formerly a doctor, but she no longer had her medical license. At Gulfshore she worked as the business manager, handling the clinic's paperwork, licensing, expenses, and payroll.
>
> In 2014 the United States Drug Enforcement Agency began investigating Gulfshore as a possible "pill mill." It sent undercover agents posing as patients to both of Gulfshore's offices. The agents discovered that Turner was prescribing large quantities of morphine, oxycodone, hydromorphone, and hydrocodone—in potentially dangerous combinations—without conducting physical exams. Turner also ignored red flags, writing prescriptions for people who admitted to past or present drug abuse and to sharing their pills with others. Cannata did not issue any prescriptions herself, but Turner often consulted with her during the agents' visits. Turner and Cannata also made comments suggesting that they knew their business was illicit: for example, Turner assured one undercover officer, who said he was looking for a "discreet" pain clinic, that Gulfshore tried to "fly under the radar," and Cannata told another agent that Turner watched the waiting room and parking lot "like a hawk" to make sure his patients were not abusing drugs too obviously.
>
> The investigation reached its climax after Turner and Cannata asked one agent, who was posing as a charter fisherman, to help

---

[1]  "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

them smuggle Cannata's Hungarian former housekeeper into the
United States from the Bahamas. The agent agreed to help in
exchange for a cash payment and more drugs, and he made
detailed plans with the defendants over the course of several
weeks. As Turner and Cannata drove to meet the agent for their
"departure" to the Bahamas, other agents pulled them over and
arrested them.

A grand jury indicted Turner and Cannata on one count of conspiring to
distribute a controlled substance, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846, four
counts of distributing a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and
(b)(1)(C) and 18 U.S.C. § 2, and one count of conspiring to bring an alien into the
United States at a place not designated as a port of entry, in violation of 8 U.S.C.
§§ 1324(a)(1)(A)(v)(1) and (a)(1)(B)(ii).  Turner and Cannata took their case to trial.
Two attorneys, Alex R. Stavrou and Patrick Leduc, represented Turner.  Cannata
retained separate counsel.  After a nine-day jury trial, the defendants were found guilty
of all charges.  The district court sentenced both Turner and Cannata to 151 months.

In their joint appeal Turner and Cannata argued that the district court abused its
discretion by refusing both to grant a mistrial based on evidentiary issues and to give a
proposed jury instruction.  Cannata challenged the sufficiency of the evidence to
support some of her convictions and her sentence.  The circuit court rejected their
challenges and affirmed.  *Cannata*, 791 F. App'x at 151.

Turner moves to vacate his convictions and sentence and claims that counsel was
ineffective for (1) not suppressing altered patient records, (2) stipulating to the
admission of altered patient records and neglecting to submit accurate records,

(3) failing to subpoena the government's confidential informant ("CI") to testify, (4) not preparing him to testify, and (5) not engaging an expert witness.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

"[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). As *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains, *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*,

466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Turner must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691–92.  To meet this burden, Turner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.  Turner cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992); *accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

### III. GROUNDS FOR RELIEF IN 20-CV-708

#### A. Ground One:

Turner claims that counsel was ineffective for not suppressing patient records that the government's CI—a Gulfshore employee—altered and improperly obtained without a warrant. (Civ. Doc. 1-1 at 1) According to Turner, the CI controlled "all aspects of urine testing," which enabled her "continuing, unfettered, alteration of the medical records and her sole manipulation of the urine lab results." (Civ. Doc. 18 at 5)

Two weeks before trial, counsel filed a joint[2] motion to supress all patient records and argued that the CI, working as an agent of the government, "tampered with patient files, urinalysis results, MRI results, and all other documents relevant to maintaining a proper and statutorily compliant medical practice[,]" which "led to the improper issuance of search warrants[.]" (Crim. Doc. 99 at 2) Counsel argued that the CI,

---

[2] Turner and Cannata entered a joint defense agreement. (Civ. Doc. 12-1 at 1)

whose employment performance was "unsatisfactory," altered the electronic medical records seized by the government because she disliked the defendants. (*Id.* at 7) The government opposed the motion and argued that the allegation of record-tampering lacked evidentiary support and the motion "[was] not grounded in a constitutional right." (Crim. Doc. 111 at 7–8)

The district court conducted an evidentiary hearing on the motion to suppress. (Crim. Doc. 116) At the hearing counsel acknowledged his "mistake" in filing the motion to suppress on the eve of trial but asked "the court not to hold that [mistake] against [the defendants] and to allow [him] to go forward . . . , [and] plead [the defendants'] case from the evidence [he has.]" (Crim. Doc. 267 at 8) The district court described the motion as "untimely" but nevertheless permitted counsel to articulate the reasons for suppression of the patient records and to present evidence to support suppression. (*Id.* at 7–9)

Counsel alleged that the CI and Task Force Officer Bruce Hernandez "intentionally went into the records and changed them." (*Id.* at 11) However, after the district court repeatedly asked counsel to proffer testimony to support this allegation, counsel eventually confirmed that he could present "no direct evidence that [Officer] Hernandez procured the cooperating witness's . . . alteration of the documents." (*Id.* at 18) Counsel also confirmed that he could present no testimony that Officer Hernandez engaged in any misconduct. (*Id.* at 13) The district court denied the motion as both untimely and meritless and reasoned that the defense could "offer no evidence that any

altered document was altered by or is an alteration produced by an agent of the United States." (*Id.* at 27)

Counsel's unsuccessful motion to suppress allegedly altered patient records does not constitute ineffective assistance of counsel. "The mere fact that counsel was unsuccessful in making certain arguments, does not, without more, direct a finding that counsel's performance was constitutionally deficient." *United States v. Walker*, No. 3:08-cr-87, 2015 WL 4389939, at *8 (N.D. Fla. July 15, 2015); *see also Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel"). Turner does not suggest what evidence of record-tampering counsel could have presented to support suppression of the patient records. And Turner was not prejudiced by the untimely filing of the motion because the district court afforded counsel ample opportunity to present evidence that the records were altered but counsel presented nothing.

Turner claims for the first time in his reply that counsel (1) lacked experience in federal court and did not understand electronic medical records and (2) "allowed false evidence against [him] to be admitted at trial" in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). (Civ. Doc. 18 at 6 and 15) Turner forfeited these claims by excluding them from his Section 2255 motion. A claim under Section 2255 raised for the first time in the reply brief is "not properly before the district court." *Wilson v. United States*, No. 16-15133, 2017 WL 3225903, at *1 (11th Cir. Feb. 23, 2017); *see Prada v. United States*, 692 F. App'x 572, 574 (11th Cir. 2017) (affirming the district court's refusal to consider new arguments raised in a reply brief because the movant "was barred from

raising new claims").  New claims raised in a reply brief are forfeited even when the movant is proceeding without counsel.  *Enriques v. United States*, 416 F. App'x 849, 850 (11th Cir. 2011) ("Although *pro se* pleadings are construed more liberally than those filed by counsel, . . . issues not argued by a *pro se* litigant in his initial brief are deemed waived.").

And, even if Turner properly raised these claims, he is entitled to no relief because he neglects to develop them with specific, non-conclusory facts.  *See Saunders v. United States*, 278 F. App'x 976, 979 (11th Cir. 2008) (explaining that a defendant must allege "reasonably specific, non-conclusory facts . . . to undermine confidence in the outcome"); *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient."); *Walker v. Dugger*, 860 F.2d 1010, 1011 (11th Cir. 1988) (explaining that a *pro se* litigant's mere discussion of a superficial claim does not give an opposing party fair notice of that claim); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (explaining that a petitioner is not entitled to an evidentiary hearing "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible") (citations omitted).

## B.  Ground Two:

Next Turner claims that counsel was ineffective for stipulating to the admission of altered patient records.  He argues that counsel's decision to "stipulat[e] that these very same tainted medical records are the true medical records of the practice" was

illogical.  (Civ. Doc. 18 at 7)  Turner explains, "FALSIFIED charts are EASILY RECOGNIZED because the date-stamp has been whited out, or, the date-stamp is different than the date of the office visit, indicated at the beginning of the office note." (Civ. Doc. 1-1 at 2) (emphasis in original).  The altered records prejudiced his defense, Turner argues, because the government's expert, Mark A. Rubenstein, M.D., formed his opinion that Turner "operat[ed] outside the realm of medicine" based on the altered records.  (Civ. Doc. 1-1 at 1)  He argues that counsel compounded this error by not introducing the patient records in their original, unaltered form.

After unsuccessfully moving to suppress allegedly altered patient records, counsel challenged the records' authenticity at trial.  During opening statements, counsel explained that "[i]t's not clear what criteria that [the CI] would have used to select these files" and that "out of roughly 1200 or so patient files that were seized by the Drug Enforcement Administration, they relied upon 16 of those files."  (Crim. Doc. 251 at 46)  Counsel for Cannata emphasized in his opening statement that the CI was a twice-fired "disgruntled employee," who "sabotage[d] the patient files" and gave them to the government without patients' permission.  (*Id.* at 50–51)

Counsel elicited testimony about the records to further challenge their authenticity.  The government's expert witness, Dr. Rubenstein, acknowledged on cross- examination that if the records he relied on to form his opinion had been altered his opinion "possibly" could be incorrect.  (Doc. 255 at 115–16)  On direct examination, Cannata's brother, who worked as the "supervisor of records . . . in charge of HIPAA office compliance," testified about the inaccuracies in the patient files

and suggested that "[s]omebody whited out the doctor's name and time stamp." (Crim. Doc. 256 at 88 and 136)

Counsel's strategic decision to stipulate to the admission of the patient records (after unsuccessfully moving to suppress the records) and to challenge their authenticity by attempting to show that the records were altered "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 698. An objection to the admission of the patient records would have been futile because the district court ruled that no basis existed for their suppression. Turner cannot overcome the strong presumption that counsel's strategic decision to challenge the records' authenticity after unsuccessfully moving to suppress them is "virtually unchallengeable." *Strickland*, 466 U.S. at 690–91.

The record shows that counsel both moved to suppress the allegedly altered patient records and challenged the records' authenticity at trial. Despite counsel's efforts, however, counsel failed to persuade the jury of Turner's innocence. "[T]he fact that a particular defense ultimately proved to be unsuccessful [does not] demonstrate ineffectiveness." *Chandler*, 218 F.3d at 1314.

Without any explanation, Turner vaguely claims that counsel should have obtained and introduced the patient records in their original, unaltered form, and that the government's failure to provide him a flash drive containing those records constitutes a violation under *Brady v. Maryland*, 373 U.S. 83 (1963). (Civ. Doc. 1-1 at 2) He is entitled to no relief on this vague and undeveloped claim.

**C.  Ground Three:**

Claiming that counsel was ineffective for failing to subpoena the CI to testify, Turner argues that "the jury needed to understand that [the CI] was the lynchpin of the prosecution's case and understand her incentive to alter and falsify the records upon which [Dr.] Rubenstein relied in rendering his opinions."  (Civ. Doc. 1-1 at 2)  Turner contends that he never wavered in his belief that the CI should testify and that he presented to his attorneys a list of proposed questions.  According to Turner, the lead attorney, Stavrou, never articulated his reasons for not calling the CI to testify and made this decision alone.

Turner's attorneys tell a different story.  Stavrou represents that he wanted to call the CI to testify but Turner "overruled" him.  (Civ. Doc. 11 at 3–4)  He explains that he "believe[d] the [CI] could have been connected to the records tampering as she . . . had password access and remote access."  (*Id*.)  However, according to Stavrou, Turner and Cannata "did not want to risk other unknowns," such as "why would the Defendant[s] offer a front office pain management position to a reforming drug abuser and former patient in control of his office."  (*Id*. at 4)  Against Stavrou's advice, Turner "opted for the [CI] not to testify."  (*Id*.)

Similarly, Leduc represents that he wanted to subpoena the CI to testify but Turner and Cannata were "strongly opposed to this course of action."  (Civ. Doc. 9 at 4)  Leduc explains (*id*.):

> My understanding is that the clients over-ruled[sic] our advice on this issue in part due to concerns about the CI being a former patient of Dr. Turner. However, I never fully understood why Dr.

> Turner refused to allow us to call the CI.  It is strange, however, that Dr. Turner would hire and put in charge of his office a reformed drug abuser and former patient, and I believed that this weighed upon the ultimate decision to not call the CI to testify.

Accepting as true that Stavrou, alone and against Turner's wishes, decided not to subpoena the CI to testify despite his belief that the CI could be connected to the alleged records tampering, Turner's claim nevertheless fails because he cannot demonstrate the decision was unreasonable.  Both Turner and Stavrou questioned the CI's credibility because of her criminal history.  In fact, Turner represents that the CI "had numerous encounters with the law involving felony offenses: possession of controlled substances, possession of drug paraphernalia, grand theft and uttering forged documents."  (Civ. Doc. 18 at 8)  Stavrou represents that a background investigation revealed that the CI "had numerous pending state level criminal matters[.]"  (Civ. Doc. 11 at 3)  Turner cannot show that Stavrou's decision not to subpoena an adverse witness with a criminal history was "so patently unreasonable that no competent attorney would have chosen [not to subpoena the witness]."  *Dingle v. Sec'y, Dep't of Corrs.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (quotations omitted) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it.").

Furthermore, Turner cannot show that, but for Stavrou's decision not to subpoena the CI to testify, a reasonable probability exists that the result of the

proceeding would have been different.  *See Strickland*, 466 U.S. at 694.  Expert

testimony at trial established that, *Cannata*, 791 F. App'x at 150:

> Turner prescribed extremely high doses of medication to his
> patients in potentially dangerous combinations. He did not
> physically examine his patients, even though his patient records
> said that he did. He also wrote prescriptions for undercover agents
> who admitted to abusing drugs and to giving drugs to others.

Turner cannot show he was prejudiced by Stavrou's decision not to subpoena the CI to

testify because evidence presented at trial established—to the exclusion of any

reasonable doubt—that Turner operated a pill mill from which he unlawfully

distributed controlled substances.

For the first time in his reply brief, Turner vaguely claims that he asked Stavrou

"many times about putting other witnesses for the defense on the stand." (Civ. Doc. 18

at 9)  He lists eleven fact witnesses and two expert witnesses and explains how their

testimony would have helped his defense.  (*Id*. at 9–12)  With the exception of Carol

Warfield, M.D., discussed *infra* under Ground Five, Turner forfeited—when he

excluded the claim from his Section 2255 motion—the claim that counsel was

ineffective for not calling these witnesses.

## D.  Ground Four:

Turner claims that counsel was ineffective for not preparing him to testify.  He

contends that Stavrou "spent little to no time whatsoever" preparing him to testify and

that the questions posed to him "were not formulated in a way [he] could understand."

(Civ. Doc. 1-1 at 3)  He contends that Stavrou neglected to provide him a list of

potential questions that Stavrou would ask and that, as a result, his testimony was

confusing and evasive.  According to Turner, "[t]he only preparation that was given to [him] was to convey 'righteous indignation' to the jury."  (Civ. Doc. 18 at 13)

Stavrou represents that before trial he facilitated a mock cross-examination with Leduc posing as the prosecuting attorney.  (Civ. Doc. 11 at 4)  Stavrou advised Turner not to testify at trial because his answers during the mock cross-examination were incoherent.  (*Id*.)  Turner nevertheless chose to testify, and Stavrou represents that he was bewildered by Turner's trial testimony (*Id*.):

> Turner's inability at trial to recall anything, or to even review a
> patient file and not be prepared to testify about it was not
> expected, was not due to lack of preparation, and was bewildering
> to the undersigned.  In fact, instead of answering (even if rambling
> or incoherently), he often responded with outrageous answers:
>
> Q:    Does reading the patient chart now refresh your
>          recollection?
>
> A:     No.

Accepting as true that Stavrou neglected both to prepare Turner to testify and to provide him a list of proposed direct examination questions, Turner cannot show he was prejudiced.  To establish prejudice within the meaning of *Strickland*, a defendant's claim that counsel neglected to prepare him to testify requires factual support.  *See Hall v. Head*, 310 F.3d 683, 701 n.9 (11th Cir. 2002) (rejecting defendant's claim that counsel's failure to prepare him to testify prejudiced him because the defendant provided no evidence for the conclusory assertion); *United States v. Parrish*, No. 1:07-cr-0006, 2014 WL 2805217, at *13 (N.D. Fla. June 20, 2014) (same).  Turner provides no factual support for his mere opinion that his testimony was confusing and evasive.  He

- 15 -

does not identify the testimony—on direct or cross-examination—he believes was confusing and evasive, nor does he explain how the outcome of the trial would have been different had counsel adequately prepared him.

Turner claims for the first time in his reply that Stavrou failed to provide unidentified materials that he requested to prepare his Section 2255 motion and that this "is another incident of Stavrou's Ineffective Assistance of Counsel." (Civ. Doc. 18 at 13) Turner forfeited this claim when he excluded it from his Section 2255 motion. And the claim lacks merit because Turner neither describes the requested materials nor explains how they support his claims.

## E. Ground Five:

Turner claims that counsel was ineffective for not engaging Carol Warfield, M.D., as an expert in pain management. (Civ. Doc. 1-1 at 3; Civ. Doc. 18 at 14–15) According to Turner, he suggested Dr. Warfield as an expert but Stavrou inexplicably failed to contact her. This failure damaged his defense, Turner argues, because Dr. Warfield would have offered "an opposing opinion" to cast doubt on the testimony of the government's expert, Dr. Rubenstein.

Again, Turner's attorneys tell a different story. Stavrou represents that he recommended Dr. Warfield but Turner "flatly, unequivocally rejected" his recommendation. (Civ. Doc. 11 at 5) He says that "Turner did not want to employ an expert witness due to the fact he believed they could not enter a valid expert opinion without proper, untampered medical records." (*Id.*) Similarly, Leduc represents that "Turner did not want to employ an expert, nor did he want to pay for one." (Civ. Doc.

9 at 5)  He explains that "Turner felt that any expert testimony on what he believed was tampered medical records would be ineffective[.]"  (*Id.*)

Counsel's failure to call a witness the defendant thinks would be helpful does not constitute ineffective assistance of counsel.  *Hardwick v. Crosby*, 320 F.3d 1127, 1161 (11th Cir. 2003).  "Which witnesses to call, and when to call them, is the epitome of a strategic decision."  *Conklin v. Schofield*, 366 F.3d 1191, 1201 (11th Cir. 2004).  To demonstrate counsel was ineffective for not calling an expert witness, a defendant must show this failure was "so patently unreasonable a strategic decision that no competent attorney would have chosen this strategy." *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001).

In an order dated March 31, 2023, the district court directed Turner to file a supplement, no later than July 1, 2023, that describes the testimony Dr. Warfield would have offered had counsel retained her.  (Civ. Doc. 29)  Turner was directed to "explain how Dr. Warfield's proposed testimony would have called into question Dr. Rubenstein's testimony in a manner that undermines confidence in the conviction" and to "support his supplement with an affidavit from Dr. Warfield or provide other evidence to show how he knows Dr. Warfield would have offered the proposed testimony if counsel had retained her."  That order was mailed to Turner at his current address at the Federal Prison Camp in Pensacola, Florida, and was not returned undeliverable.  Nevertheless, to date, Turner has neither complied with the order nor sought an extension of time to do so.

Accepting as true that Stavrou, alone and against Turner's wishes, decided not to retain Dr. Warfield as an expert witness, Turner's claim fails.  Despite being afforded an opportunity to supplement this claim, Turner neglects to (1) describe the testimony Dr. Warfield would have offered, (2) identify the specific portions of Dr. Rubenstein's testimony on which Dr. Warfield's proposed testimony would cast doubt, or (3) explain how Dr. Warfield's proposed testimony would undermine confidence in his conviction. Turner shows neither that no competent attorney would have chosen not to retain Dr. Warfield nor that Dr. Warfield's testimony would have resulted in a different outcome at trial.

Turner claims for the first time in his reply that counsel should have retained Howard Heit, M.D., as an expert addictionologist.  (Civ. Doc. 18 at 14)  Turner forfeited this claim when he excluded it from his Section 2255 motion.  And the claim lacks merit because Turner fails to describe the testimony Dr. Heit would have offered and explain how the proposed testimony would have resulted in a different outcome at trial.

Consequently, Turner is entitled to no relief based on the grounds for relief alleged in 20-cv-708.

## IV. *RUAN* CLAIM IN 23-CV-1427

A jury convicted Turner of (1) a count of conspiracy to distribute and dispense and cause the distribution and dispensing of oxycodone, hydromorphone, morphine, and hydrocodone (count one) and (2) four counts of distributing and dispensing and causing the distribution and dispensing of a controlled substance, specifically,

- 18 -

hydrocodone (count two), oxycodone (count three), morphine (count four), and both oxycodone and hydromorphone (count five).[3]  Each of the latter four convictions is under 21 U.S.C. § 841(a), which prohibits the "knowing or intentional" distribution and dispensing of a controlled substance "except as authorized."  A licensed physician is authorized to prescribe an otherwise proscribed controlled substance when the prescription is "for a legitimate medical purpose [and prescribed] in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).  *Ruan v. United States*, 142 S. Ct. 2370, 2374 (2022) ("*Ruan I*"), holds "that the statute's "knowingly or intentionally" *mens rea* applies to authorization[, specifically,] the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."  On remand, *Ruan v. United States*, 56 F.4th 1291, 1296 (11th Cir. 2023) ("*Ruan II*"), *petition for cert. filed* (U.S. June 5, 2023) (No. 22-1175), summarizes *Ruan I* as follows: "Thus, to obtain a conviction under this section, the government must prove beyond a reasonable doubt that a defendant (1) knowingly or intentionally dispensed a controlled substance; and (2) knowingly or intentionally did so in an unauthorized manner."  Moreover, "what matters is the defendant's subjective *mens rea*."  *Id.*

Turner's convictions became final in 2020 upon the expiration of the time permitted to petition for a writ of *certiorari* — two years before *Ruan I*.  Assuming that

---

[3] Although not related to the claim in 23-cv-1427, the jury convicted Turner of conspiracy to smuggle an alien into the United States (count six).

he is correct that *Ruan I* applies retroactively, Turner gains no benefit from *Ruan I*.  The

linchpin to entitlement to relief under *Ruan I* is whether Turner knew that he was

dispensing a controlled substance "in an authorized manner."  Turner's jury was

charged as follows (Doc. 257 at 68–69 in 15-cr-264):

> As to Counts Two, Three, Four, and Five, it is a federal crime for anyone to knowingly and intentionally distribute or dispense or to cause the distributing or dispensing of a controlled substance either not for a legitimate medical purpose or not in the usual course of professional practice.
>
> Now, under the law, oxycodone, hydromorphone, morphine, and hydrocodone are each a controlled substance.
>
> . . . .
>
> Thus the defendant, who is a licensed medical doctor, can be found guilty of the offense charged in Counts Two, Three, Four, and Five only if the United States has proved the following, each of the following, beyond a reasonable doubt:
>
> First, that the defendant distributed, dispensed, or caused the distributing or dispensing of the controlled substance as charged; and,
>
> Second, that at the time of the distributing or dispensing the defendant knew that the defendant was distributing or dispensing a controlled substance not for the legitimate medical purpose and not in the usual course of professional practice.
>
> A controlled substance is prescribed by a physician in the usual course of professional practice and, therefore, lawfully if the substance is prescribed by the physician as part of the physician's medical treatment of the patient in accord with the standards of medical practice generally recognized and accepted in the United States.

The above jury instruction comports with *Ruan I*, specifically, the jury was charged that

they could return a guilty verdict only if they unanimously find that Turner "knew that

[he] was . . . dispensing a controlled substance not for the legitimate medical purpose and not in the usual course of professional practice."

Consequently, Turner is entitled to no relief based on the *Ruan* claim alleged in 23-cv-1427.

Turner's motion under Section 2255 to vacate, set aside, or correct his conviction and sentence (Civ. Doc. 1) is **DENIED**.  The clerk is directed to enter a judgment against Turner, close both this case and 23-cv-1427, and enter a copy of this order in the criminal case.

## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL IN FORMA PAUPERIS

Turner is not entitled to a certificate of appealability ("COA").  A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's denial of his motion to vacate.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  To merit a certificate of appealability, Turner must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues she seeks to raise.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).  Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Turner is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

A certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Turner must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on September 26, 2023.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE